UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

IVY SAMS and RUTH SNOW,            )
                                   )
            Plaintiffs,            )          Civil Action No. 3:19-cv-625-CHB
                                   )
v.                                 )
                                   )     **MEMORANDUM OPINION AND ORDER**
THE ANTHEM COMPANIES, INC.,        )
                                   )
            Defendant.             )
                                   )
                    ***   ***   ***   ***

This matter is before the Court on Defendant The Anthem Companies, Inc.'s

("Anthem's") Motion for Summary Judgment [R. 20]. Plaintiffs Ivy Sams and Ruth Snow

responded in opposition [R. 22]. Defendant replied to Plaintiffs' Response [R. 28]. The matter is

now ripe for review. For the following reasons, the Court will grant Defendant's Motion for

Summary Judgment.

### I.      Background

This dispute stems from Anthem's decision to lay off Plaintiffs, as well as 6 other

employees, on January 31, 2019, as part of a reduction in force ("RIF") in its Health Care

Management Services Department in Louisville. At the time of their termination, Sams was 66

and Snow was 65, and they claim they were terminated because of their age and other unlawful

reasons. Defendant Anthem is a national health insurance company. [R. 20-3, p. 97 (Collins

Aff.)] As part of its operations, Anthem employs a team of nurse case managers, who are

designated into three different classifications: Nurse Case Manager I ("NCM I"), Nurse Case

Manager II ("NCM II"), and Nurse Case Manager Lead ("NCML") that functioned as the "team

lead." [R. 31-5 (Snow Dep.), pp. 49–50; R. 31-6 (Sams Dep.), pp. 12–13; R. 28-1, p. 32 (salary

1

chart)] Of the three positions, NCM I had the lowest experience, responsibilities, and salary; NCM II was in the middle; and NCML had the highest. [R. 31-5 (Snow Dep.), pp. 49–50; R. 28-1, p. 32 (salary chart)]

The case management teams are split up by geographic area and type of insurance. Kentucky Medicaid had a team of 8 case managers in 2015, which grew to 11 by the end of 2018. [R. 31-6 (Sams Dep.), p. 12; R. 22, p. 9] In 2018, there were two NCM I positions, eight NCM II positions, and one NCML. [R. 22, p. 9] Sams began as NCML on February 3, 2015. [R. 23-3] She is a Registered Nurse and had worked for over two decades in a variety of federal, state, and private nursing and case management–related jobs before coming to Anthem. [R. 31-6 (Sams Dep.), pp. 11–12] Snow began as an NCM II on August 22, 2016. [R. 23-4] She was also a Registered Nurse and a board-certified case manager, and she worked in state-run and private insurance case management before starting at Anthem. [R. 31-5 (Snow Dep.), pp. 4–5, 35, 50] A Case Management Manager managed that team. [R. 22, p. 2; *see also* R. 23-3; R. 23-4] The Case Management Manager reported to the Director of Healthcare Management Services, who at all relevant times was Victoria Meska. [R. 31-2 (Thompson Dep.), pp. 20–21; R. 31-1 (Meska Dep.), pp. 17–18]

A. Events Prior to the Reduction in Force

In mid-2017, the previous Case Management Manager, Nancy Redmon, resigned after having issues with Meska. [R. 31-1 (Meska Dep.), pp. 42–44] She was replaced in September 2017 by Eugenia Thompson, whom Meska had worked with in a previous job. *Id.* at 44–46. Thompson, unlike Redmon and Meska, is not a board-certified case manager. [R. 31-2 (Thompson Dep.), p. 20; R. 31-1 (Meska Dep.), pp. 24, 31] After Redmon left, Sams and Snow had a number of issues with Thompson and Meska, which are detailed below.

2

First, Snow, who has a hearing impairment, had difficulty obtaining a headset to use with her hearing aid. Snow first tried to obtain a headset in June or July 2017—sometime before July 7, 2017—and filed a complaint to obtain the headset. [R. 31-5 (Snow Dep.), pp. 14, 22–24] On August 7, 2017, she resolved to buy the headset herself and get reimbursed. *Id.* at 25. She was approved for reimbursement on August 23, 2017, but she asserts that it took her "months" to get reimbursed. *Id.* at 25–28.

Second, starting sometime in early 2018, Anthem directed all case managers to work remotely. [*See* R. 31-2 (Thompson Dep.), pp. 120–21; R. 31-6 (Sams Dep.), pp. 20–22 ("[S]omewhere in 2018 they sent all the case managers home.")] Initially, Sams and Snow were the only case managers still working from the office, but eventually they were sent home as well. [R. 31-2 (Thompson Dep.), pp. 120–21; R. 31-6 (Sams Dep.), pp. 20–21] Snow was assigned to work from home on April 16, 2018. [R. 20-3, p. 106 (Thompson Aff.)] Snow had been on Family and Medical Leave Act ("FMLA") leave for much of the early part of 2018 and came back into the office in May with an oxygen concentrator. [R. 31-5 (Snow Dep.), p. 13–14; R. 22, p. 6] Thompson asked her to work from home, which she objected to. [R. 31-5 (Snow Dep.), pp. 13–14] Once she started working from home, she requested another hearing aid–compatible headset, which Anthem provided after several emails. *Id.* at 14–15. Snow notes that this process for the second headset was much smoother and asserts that there is "no relationship of the 2018 hearing device to the decision to terminate [her] employment." *Id.* at 57.

Third, in November 2017, Thompson required Sams to start "conduct[ing] formal audits of case managers. [R. 22, p. 4; R. 31-6 (Sams Dep.), p. 15] Sams viewed these audits as unnecessary and struggled to complete them. [R. 22, pp. 4–5] As a result, she was put on a 30-day Performance Improvement Plan on February 16, 2018, which escalated to a 60-day

Corrective Action on April 11, 2018. [R. 22, pp. 5–6; R. 23-10; R. 20-3, p. 106–07 (Thompson Aff.)] That Corrective Action plan ("CAP") expired in June and was not followed by any further improvement process. [R. 22, p. 6; R. 23-15] During this time frame, Sams was also taking FMLA leave. Her first period of leave occurred in October 2017, to care for her mother, which was approved. [R. 31-6 (Sams Dep.), pp. 86–88] She then took intermittent leave on March 27, 2018, for six months, to address her own health issues. [R. 23-12 (FMLA leave summary)]

Finally, Sams and Snow feuded with management over professional practices that Thompson and Meska implemented. Around September 2018, Anthem began directing case managers not to identify their names in patient records. [R. 23-18; R. 22, p. 7] Sams and Snow disagreed with this practice, and Snow raised the issue with the Kentucky Board of Nursing and notified Thompson of her communication. [R. 31-5 (Snow Dep.), p. 41] Meska, however, was not aware of this dispute until this litigation started. [R. 31-1 (Meska Dep.), pp. 210–11] They also had issues in approving treatment. In October 2018, Snow attempted unsuccessfully to get Anthem to provide a cancer treatment for a client who later died, sending 93 emails on the subject. [R. 31-5 (Snow Dep.), pp. 43–47] Meska and Snow had a phone conversation about the treatment on November 5, 2018. [R. 31-1 (Meska Dep.), pp. 169–71] And in December 2018 or January 2019, Sams feuded with Meska over Anthem's refusal to provide out-of-network baby formula to a client. [R. 31-6 (Sams Dep.), pp. 40–44]

B. The Reduction in Force

In October 2018, Anthem performed a "Work Evaluation" that assessed its operations in each state. [R. 20-3, p. 97 (Collins Aff.)] It also started to restructure and centralize some of its business, prompting some of its regional divisions to try to cut costs by laying off employees. *Id.* Kentucky was directed to cut $500,000 in costs. *Id.* Shaun Collins, the Human Resources

Business Partner, Sr., for the Kentucky and West Virginia Medicaid Business Units, worked with the regional vice president, Urmesh Shah, and the Louisville market president, Leon Lamoreaux, to identify positions that could be eliminated. *Id.*

On November 28, 2018, Collins emailed Thompson, whom he knew kept a quarterly assessment form for the case managers, to send him those assessment forms, which she did.[1] [R. 23-21 (Email from Thompson to Collins); R. 23-23 (Email from Thompson to Collins)] Collins did not mention the potential restructuring and layoffs. [R. 31-2 (Thompson Dep.), pp. 111–13] That email included the following ratings for all categories of case managers:

| | Last Name | First Name[2] | Job Title | Score[2] | Age at RIF |
|---|---|---|---|---|---|
| **Exceeds Expectations** | Ulliman | Nora | Nurse Case Mgr II | 32 | 61 |
| | Davis | Diane | Nurse Case Mgr II | 33 | 55 |
| **Meets Expectations** | Clements | Mary | Nurse Case Mgr II | 37 | 65 |
| | Jones | Linda | Nurse Case Mgr II | 38 | 66 |
| | Siler | Dawn | Nurse Case Mgr II | 41 | 57 |
| | Waddle | Kimberly | Nurse Case Mgr I | 43 | 50 |
| | Sams | Ivy | Nurse Case Mgr Lead | 45 | 66 |
| | Mefford | April | Nurse Case Mgr II | 45 | 45 |
| | Snow | Ruth | Nurse Case Mgr II | 29/FMLA-Q1 | 65 |
| **Does Not Meet Expectations** | Meador | Deborah | Nurse Case Mgr I | 46 | 60 |
| | Caldwell | Christina | Nurse Case Mgr II | 52 | 46 |

[R. 23-23 (Email from Thompson to Collins)][3] That same day, November 28, 2018, Collins suggested eliminating five positions in Kentucky, including the NCML and one NCM II. [R. 23-22] On November 29, 2018, Shah suggested eliminating 5–6 NCMs from Louisville in a "first pass effort." [R. 20-3, pp. 97–98 (Collins Aff.)] That same day, Collins countered with

---

[1] Thompson's first email to Collins included an error in the assessment, as she did not account for Snow's FMLA leave. She followed up within the hour with a second email that fixed this error. The score for Snow, then, is proportionally lower because fewer time periods were considered and the scores are cumulative. [R. 23-21; R. 23-23 (Email from Thompson to Collins)] All future references to the assessment use the table from the second email.

[2] In Thompson's metric, lower scores indicate higher performance. [R. 23-23 (Email from Thompson to Collins)]

[3] Thompson's assessment does not list employees' age. That information is added here for reference. [R. 22, p. 10; R. 23-23 (Email from Thompson to Collins)]

eliminating the NCML and two NCM IIs as "appropriate for the workload and cost-cutting goal," with an NCML being unnecessary if there were 2 fewer NCM IIs. *Id.* Ultimately, after discussions between them, Collins, Shah, and Lamoureaux forwarded a list of 10 full-time positions, without names, in the Louisville office "that could be eliminated if there were a staffing change in the future," including the NCML and now two NCM IIs, to Anthem's vice president of Medicaid clinical operations. [R. 20-3, p. 98 (Collins Aff.); R. 29, p. 32 (Email from Collins to Shah)]

Just before these events, on November 27, 2018, Sams took intermittent FMLA leave again to care for her mother. [R. 22, p. 19] Neither Meska nor Anthem's HR team deciding layoffs knew of the leave before selecting positions for elimination. [R. 20-3, p. 98 (Collins Aff.); R. 20-3, p. 104 (Meska Aff.)]

The next week, on December 5, 2018, Collins received a request to have directors in the region fill out an assessment form for the positions that were identified for elimination. [R. 20-3, p. 98 (Collins Aff.)] Collins forwarded the request to Meska, again not mentioning that it might be connected to layoffs. [R. 22, pp. 10–11; R. 31-1 (Meska Dep.), pp. 176–77; R. 23-24 (Email from Collins to Meska)] The form required Meska to complete an assessment for all employees in her department in the positions indicated for RIF, with the categories of "Skills and Competencies" and "Values." [R. 23-24 (Email from Collins to Meska)] Meska completed the form and sent it to Collins 74 minutes later, assigning a rating of "1" for the lowest performers, "2" for the middle, and "3" for the highest. [*Id.*; R. 23-25 (Email from Meska to Collins)] Meska graded 27 employees and gave a total of 9 employees scores of "1" in both categories. Those employees span a wide range of ages:

| Name | Job Title | Age |
|---|---|---|
| Lee Perry | Medical Mgmt. Specialist I | 22 |
| Mercedes Lopez | Medical Mgmt. Specialist I | 24 |
| Melissa Meiners | Administrative Assistant I | 29 |
| Christina Caldwell | NCM II | 46 |
| Aldean Riley | Medical Mgmt. Specialist I | 53 |
| Dawn Siler | NCM II | 57 |
| Ruth Snow | NCM II | 65 |
| Ivy Sams | NCML | 66 |
| Katrina Johnson[4] | Medical Mgmt. Specialist I | |

[R. 23-25 (Email from Meska to Collins); R. 20-3, p. 103 (Meska Aff.)] All case managers in

Louisville were over 40 years old at the time of Meska's evaluation. [R. 20-3, p. 104 (Meska

Aff.)]

After December 5, 2018, Collins added certain other positions/employees to the chart

containing assessments, [R. 23-26 (Email from Collins to Jordanhazy); R. 29, pp. 28–30 (Email

from Collins to Jordanhazy)], including the two NCM Is, Kimberly Waddle and Deborah

Meador, though ultimately the position of NCM I was not part of the RIF. [R. 23-26 (Email from

Collins to Jordanhazy); R. 29, pp. 28–30 (Email from Collins to Jordanhazy); *see also* R. 20-3, p.

98 (Collins Aff.)] The assessments for all NCM Is and NCM IIs, and for Sams, the sole NCML,

were as follows:

| Last Name | First Name | Job Title | Date in Position | Skills and Competencies | Values | Age at RIF |
|---|---|---|---|---|---|---|
| Davis | Diane | Nurse Case Mgr II | 8/25/2014 | 3 | 3 | 55 |
| Clements | Mary | Nurse Case Mgr II | 4/18/2016 | 3 | 3 | 65 |
| Jones | Linda | Nurse Case Mgr II | 8/25/2014 | 3 | 3 | 66 |
| Mefford | April | Nurse Case Mgr II | 4/16/2018 | 3 | 3 | 45 |
| Ulliman | Nora | Nurse Case Mgr II | 9/8/2014 | 3 | 2 | 61 |
| Waddle | Kimberly | Nurse Case Mgr I | 5/14/2018 | 2 | 2 | 50 |
| Meador | Deborah | Nurse Case Mgr I | 7/23/2018 | 2 | 2 | 60 |
| Siler | Dawn | Nurse Case Mgr II | 4/7/2014 | 1 | 1 | 57 |
| Sams | Ivy | Nurse Case Mgr Lead | 2/23/2015 | 1 | 1 | 66 |
| Snow | Ruth | Nurse Case Mgr II | 8/22/2016 | 1 | 1 | 65 |
| Caldwell | Christina | Nurse Case Mgr II | 10/30/2017 | 1 | 1 | 46 |

---

[4] The record does not indicate Johnson's age.

[R. 29, pp. 28–30 (Email from Collins to Jordanhazy)][5]

Collins sent the final list to Michelle Jordanhazy, the Human Resources Business Partner Director, on December 10, 2018. [R. 20-3, p. 99 (Collins Aff.); R. 29, pp. 28–30 (Email from Collins to Jordanhazy)] The HR team used that assessment and determined who would be laid off using a formula that did not include age as a factor. [R. 20-3, p. 100 (Jordanhazy Aff.)] Using that formula, the HR team decided to lay off the workers with the lowest scores for each position identified for elimination, using seniority as a tiebreaker if scores were equal. *Id.*

Ultimately, the HR team laid off eight employees in Kentucky Medicaid, including two case managers, Snow and Siler (both NCM IIs), and Sams, the sole NCML. *Id.* Siler was let go in error. Siler, Snow, and Caldwell, all NCM IIs, were the lowest-scoring NCM IIs, each receiving "1s" in both categories (a 3-way tie). The order of seniority (the tiebreaker under the formula) was: Siler (the most senior), then Snow, then Caldwell. *Id.* at 101. According to the formula, Snow and Caldwell should have been terminated (as the two least senior of the group), but instead it was Snow and Siler.[6] In any event, Snow was correctly laid off as she was not the most senior of the three. *Id.*

On January 29, 2019, Collins received the list of 8 employees to be laid off, and he let the affected employees know on January 31, 2019. [R. 20-3, p. 99 (Collins Aff.)] Snow and Sams were laid off effective March 2, 2019. *Id.* Of the 8 employees let go as part of the RIF, Meska completed assessments on 7 of them. [R. 20-3, p. 103 (Meska Aff.)] Of the 7 employees Meska assessed who were ultimately terminated, all had the lowest score possible and covered a broad

---

[5] Again, Collins's assessment does not list employees' age. That information is added here for reference. [R. 22, p. 10; R. 29, pp. 28–30 (Email from Collins to Jordanhazy)]

[6] Siler was actually retained in a different position at Anthem after it realized the mistake. [R. 20-3, p. 104 (Meska Aff.)]

range of ages. Specifically, 3 were under the age of 30—Perry (22), Lopez (24), Meiners (29)—
and 4 were above the age of 40—Sams (66), Snow (65), Siler (57) and Riley (53). [R. 23-25
(Email from Meska to Collins)]

C. Procedural History

On August 8, 2019, Plaintiffs sued in Jefferson County Circuit Court for age
discrimination (Count I), retaliation for taking FMLA leave (Count II), retaliation for asking for
a disability accommodation (Count III), and wrongful discharge in violation of Kentucky public
policy (Count IV). [R. 1-2 (Complaint)] On August 30, 3019, Defendant removed to this Court.
[R. 1] After discovery, Defendant moved for summary judgment on all claims on September 25,
2020. [R. 20] After a Response [R. 22] and Reply to the Response [R. 28], the Motion for
Summary Judgment is before the Court.

## II.    Standard of Review

Summary judgment is proper where "the movant shows that there is no genuine dispute
as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.
56(a). When determining a motion for summary judgment, a court must construe the evidence
and draw all reasonable inferences from the underlying facts in favor of the nonmoving party.
*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Lindsay v.
Yates*, 578 F.3d 407, 414 (6th Cir. 2009). The court may not "weigh the evidence and determine
the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 477
U.S. 242, 265 (1986). The initial burden of establishing no genuine dispute of material fact rests
with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court "need
consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ.
P. 56(c)(3). Where "a party fails to properly support an assertion of fact or fails to properly

9

address another party's assertion of fact," the Court may treat that fact as undisputed. Fed. R. Civ. P. 56(e). A fact is "material" if the underlying substantive law identifies the fact as critical. *Liberty Lobby*, 477 U.S. at 248. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

### III.    Discussion

Plaintiffs allege four causes of action against Defendant: (1) age discrimination against both Plaintiffs in violation of the Kentucky Civil Rights Act (KCRA), Ky. Rev. Stat. § 344.040 (Count I) [R. 1-2 (Complaint), ¶¶ 18–22], (2) retaliation against Sams for taking leave in violation of the FMLA (Count II) [R. 1-2 (Complaint), ¶¶ 23–27], (3) retaliation against Snow for asking for an accommodation in violation of the KCRA, § 344.280 (Count III) [R. 1-2 (Complaint), ¶¶ 28–31], and (4) tortious wrongful discharge in violation of Kentucky public policy (Count IV) [R. 1-2 (Complaint), ¶¶ 32–35]. The Court will address each issue in turn.

A.   Age Discrimination

Plaintiffs allege that their termination as part of the RIF constituted age discrimination because they were qualified for their jobs and older than several co-workers who were not terminated. [R. 1-2 (Complaint), ¶¶ 19–20] Age discrimination claims under the KCRA are "'analyzed in the same manner' as ADEA claims." *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 393 (6th Cir. 2008); *accord Harker v. Fed. Land Bank of Louisville*, 679 S.W.2d 226, 229 (Ky. 1984) ("The Kentucky age discrimination statute is specially modeled after the Federal law. Consequently, in this particular area we must consider the way the Federal act has been

interpreted."). "A plaintiff who brings an age-discrimination claim based on a disparate-treatment theory 'must prove that age was a determining factor in the adverse employment action that the employer took against him.'" *Allen*, 545 F.3d at 394[7] (quoting *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1023 (6th Cir. 1993)). Plaintiffs can show age discrimination through either direct evidence or circumstantial evidence. *Back v. Nestle USA, Inc.*, 694 F.3d 571, 576 (6th Cir. 2012).

"Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc)). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Allen*, 545 F.3d at 394 (quoting *Wexler*, 317 F.3d at 570). Age discrimination claims based on circumstantial evidence in Kentucky and on the federal level "are analyzed under the standard set by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)." *Story v. Int'l Specialties Prods.*, No. 5:07-CV-15-R, 2008 WL 1926872, at *3 (W.D. Ky. Apr. 30, 2008); *accord Allen*, 545 F.3d at 394 ("Where a claim of age discrimination is based largely on circumstantial evidence, we analyze the claim under the three-step *McDonnell Douglas* framework."); *Wexler*, 317 F.3d at 574. Here, Plaintiffs do not allege any direct evidence of discrimination.[8] [R. 1-2 (Complaint), ¶¶ 7–17; R. 22, p. 13 ("Where

---

[7] The Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA") also allows disparate-impact claims, but Plaintiffs do not allege disparate impact. *Allen*, 545 F.3d at 403.

[8] The record indicates that Plaintiffs' supervisor, Thompson, made comments about retirement to Plaintiffs in various discussions. [R. 31-5 (Snow Dep.), p. 52; [R. 31-6 (Sams Dep.), p. 53] Plaintiffs do not raise this point in their Response, and the Court will not consider it here. At any rate, a supervisor discussing retirement does not generally constitute evidence of age discrimination. *See Metz v. Titanium Metals Corp.*, 475 F. App'x 33, 34–35 (6th Cir. 2012) (finding no *prima facie* case when a human

there is no direct evidence of discrimination, an age discrimination claim is evaluated under the

*McDonnell-Douglas* burden shifting framework.")]

In the absence of direct evidence of discrimination, the Court is guided by the *McDonnell*

*Douglas* burden-shifting framework. The first step of the *McDonnell Douglas* framework

> requires the plaintiff to establish a prima facie case of age discrimination by
> showing that the plaintiff (1) was a member of a protected class of persons (i.e.,
> persons 40 years of age or over), (2) was discharged, (3) was qualified for the
> position held, and (4) was replaced by someone outside of the protected class.

*Allen*, 545 F.3d at 394 (citations omitted) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*,

154 F.3d 344, 350 (6th Cir. 1998)). In a case arising out of a workforce reduction, like this one,

the fourth requirement for a *prima facie* case is modified so that the plaintiff must demonstrate

"additional direct, circumstantial, or statistical evidence tending to indicate that the employer

singled out the plaintiff for discharge for impermissible reasons." *Geiger v. Tower Auto.*, 579

F.3d 614, 623 (6th Cir. 2009) (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir.

1990)); *Story*, 2008 WL 1926872, at *3 (quoting *Phelps*, 986 F.2d at 1023). This additional

evidence amounts to a "heightened proffer" the plaintiff must make. *Norbuta v. Loctite Corp.*, 1

F. App'x 305, 312 (6th Cir. 2001). It is undisputed that Defendant laid off Plaintiffs pursuant to

an RIF, as Plaintiffs' former jobs have not been filled. [R. 20-3, p. 104 (Meska Aff.); R. 22, pp.

9, 14]

Once the employee satisfies this burden, "the burden of production shifts to the employer

to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Allen*,

545 F.3d at 394 (quoting *Ercegovich*, 154 F.3d at 350). If the employer meets this burden, the

---

resources manager mentioned another employee's likely retirement in an email); *Mastellone v. Publix Super Markets, Inc.*, 179 F. Supp. 3d 784, 797 (E.D. Tenn. 2016) ("The fact that employees mention or ask about retirement is not evidence of age discrimination.").

burden of production shifts back to the employee to rebut the employer's proffered reason by showing by a preponderance of the evidence "that the employer's nondiscriminatory explanation is a mere pretext for intentional age discrimination." *Id.*; *Barnes*, 896 F.2d at 1464. Importantly, the burden of persuasion remains on the employee. *Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 143 (2000).

Even assuming Plaintiffs could make a *prima facie* case for age discrimination, summary judgment is still appropriate because Plaintiffs cannot show that Anthem's proffered reasons for discharge—the reduction in force for cost-cutting reasons implemented by the age-neutral assessments—were pretextual. *See Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 724–25 (6th Cir. 2012).

1. Plaintiff Sams

Under the *McDonnell Douglas* framework, once an employee establishes a *prima facie* case of discrimination, the employer must produce "legitimate nondiscriminatory reasons" for the discharge. *Allen*, 545 F.3d at 394. Here, Defendant points to the RIF process that found that eliminating Sams's position would cut costs. [R. 20-1, pp. 11–12] The evidence is undisputed that, after a "Work Evaluation," Anthem's regional divisions attempted to cut costs by laying off employees. [R. 20-3, p. 97 (Collins Aff.)] As part of the initial discussions among decision-makers, Collins suggested that the position of NCML (held at the time by Sams) be eliminated, along with two NCM II positions. [R. 20-3, p. 98 (Collins Aff.)] Pursuant to the attempt to cut costs, and based on Collins's familiarity with the NCML position, Sams's salary, and Sams's work history, Collins determined that the position of NCML would no longer be needed with the number of NCM IIs being reduced by 2. [*Id.*; R. 20-1, p. 7] Sams held the only NCML position in her department; therefore, she was selected for the RIF. [R. 20-1, p. 7; R. 20-3, p. 99 (Collins

Aff.)] This cost-cutting and efficiency motive meets Defendant's burden of production for offering "legitimate nondiscriminatory reasons" for the discharge. *See Lefevers*, 667 F.3d at 725.

Accordingly, the burden shifts to Plaintiffs to show that Defendant's proffered reasons for discharging Sams were pretextual. *Allen*, 545 F.3d at 394. "For a plaintiff to show pretext, he must show the employer's given reason for its conduct 'had no basis in fact, did not actually motivate the defendant's challenged conduct, or was insufficient to motivate the defendant's challenged conduct.'" *Lefevers*, 667 F.3d at 725 (quoting *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 268 (6th Cir. 2010)); *accord Wexler*, 317 F.3d at 576. Although the Sixth Circuit discourages the rigid application of this test, *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012), it remains "a convenient way of marshaling evidence," *id.* Ultimately, "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Chen v. Down Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009); *accord Tingle*, 692 F.3d at 530.

In their Response to the Motion for Summary Judgment, Plaintiffs assert that the RIF's emphasis on eliminating specific positions like the NCML simply covered up Anthem's desire to "target[] specific individuals for elimination." [R. 22, p. 16] Plaintiffs argue that, because Anthem talked about the need to lay off "underperformers" from the group of case managers as a whole, Anthem was not actually concerned with eliminating certain positions like NCM II and NCML. [*Id.*; *see* R. 23-22]

In reply, Defendant maintains that the decision to eliminate Sams's NCML position was based on the redundancy of the position after staffing cuts, rather than a desire to specifically remove Sams. [R. 28, p. 5] It argues that Sams's performance should not be grouped with other case managers (the NCM Is, who were not even part of the RIF, or the NCM IIs), since the

NCML position was "a distinct supervisory job classification," with different salary and different job requirements. *Id.*

None of the evidence that Plaintiffs present shows that Anthem's cost-cutting reasons in laying off Sams 'had no basis in fact, did not actually motivate the defendant's challenged conduct, or was insufficient to motivate the defendant's challenged conduct.'" *See Lefevers*, 667 F.3d 725 (quoting *Schoonmaker*, 595 F.3d at 268). Plaintiffs do not argue that Anthem's cost-cutting rationale had no basis in fact. [*See* R. 22] Rather, Sams admits that it is up to the "manager's opinion" whether an NCML is necessary with fewer case managers to supervise. [R. 31-6 (Sams Dep.), pp. 16–18]; *cf. Bien v. U.S. Fid. & Guar. Co.*, No. CIV. HM-93-1756, 1994 WL 733564, at *1 n.2, *6 (D. Md. Aug. 15, 1994) (finding that an employer laying off supervisors pursuant to an RIF where it combined offices and also laid off non-supervisory employees was not pretextual). Accordingly, Plaintiffs have not carried their burden of showing Anthem's proffered reason to discharge Sams "had no basis in fact." *See* S*kelton v. Sara Lee Corp.*, 249 F. App'x 450, 460 (6th Cir. 2007).

Nor do Plaintiffs argue that the cost-cutting motive was insufficient to motivate her discharge. [*See* R. 22] This type of evidence "ordinarily consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 471–72 (6th Cir. 2002) (quoting *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994) (*overruled on other grounds by Geiger*, 579 F.3d 614)). Plaintiffs present no evidence suggesting that similarly situated NCMLs were not fired (Sams was the only NCML) or that the cost-cutting motive was insufficient to motivate Sams's discharge. Indeed, it is undisputed that Anthem laid

Case 3:19-cv-00625-CHB-CHL   Document 37   Filed 07/19/21   Page 16 of 34 PageID #: 2827

off a total of 8 employees in the department pursuant to the RIF. [R. 20-3, p. 99 (Collins Aff.)] Plaintiffs have not carried their burden of showing Anthem's proffered reason to discharge Sams was insufficient to motivate her discharge. *See Skelton*, 249 F. App'x at 461.

Rather, Plaintiffs argue that, because Anthem focused on "underperformers" as it crafted a list of positions to be discharged, and because it evaluated all case managers together regardless of grade, eliminating a superfluous NCML position did not actually motivate its conduct. But the uncontroverted differences in pay and job qualifications between the NCML position and other case manager positions undermine Plaintiffs' argument that Anthem did not care about the specific positions it eliminated. Rather, Anthem attempted to cut costs as part of a larger RIF, so it would only be natural to eliminate a higher-paying supervisory position whose supervisory role would be superfluous upon the elimination of 2 employees under that supervisor's management. [*See* R. 28-1, p. 32 (salary chart)]; *Sims v. MVM, Inc.*, 704 F.3d 1327, 1330, 1334 (11th Cir. 2013) (finding that an employer laying off supervisors pursuant to an RIF was not pretextual when it needed to cut costs); *Gatch v. Milacron, Inc.*, 111 F. App'x 785, 791 (6th Cir. 2004) (finding not pretextual a demotion based on the employer's determination that its employee's unique skill set would be superfluous to the company after an RIF); *Steiner v. Envirosource, Inc.*, 134 F. Supp. 2d 910, 919–20 (N.D. Ohio 2001) (finding not pretextual a discharge based on the employer's determination that its employee's position would be expendable as part of an RIF, even when the supervisor making that determination was familiar with the employee's work). Collins's familiarity with Sams's performance[9] and work history (which included a PIP and Corrective Action plan) does not negate the fact that the NCML position was the most economical to eliminate as part of the RIF. As Collins put it, he "believed

---

[9] Indeed, on performance, Meska rated her with the lowest scores possible—two "1"s. [R. 23-25 (Email from Meska to Collins)]

that with the number of NCM IIs potentially being reduced by 2 there would be no need for the Lead position." [R. 20-3, p. 98 (Collins Aff.)] Therefore, Plaintiffs have not carried their burden of showing that the cost-cutting rationale did not motivate the decision to discharge Sams pursuant to the RIF. *See Gatch*, 111 F. App'x at 791; *Steiner*, 134 F. Supp. 2d at 919–20.

Plaintiffs have not carried their burden of showing that Anthem's cost-cutting motive "had no basis in fact, did not actually motivate the defendant's challenged conduct, or was insufficient to motivate the defendant's challenged conduct." *Lefevers*, 667 F.3d at 725 (quoting *Schoonmaker*, 595 F.3d at 268). Nor have they carried their burden of showing Anthem's RIF (and the resulting elimination of Sams's position) was pretextual in any other way. Accordingly, even when construing the evidence in favor of Plaintiffs, Plaintiffs cannot show by a preponderance of the evidence that the cost-cutting rationale for Sams's discharge was pretextual. Because Plaintiffs have not met their burden under the *McDonnell Douglas* framework, the Court will grant summary judgment to Defendant on Sams's age discrimination claim.

2. Plaintiff Snow

Under the *McDonnell Douglas* framework, Defendant identifies its "legitimate nondiscriminatory reasons" for Snow's discharge as the decision to eliminate two NCM II positions pursuant to the RIF, Snow's poor performance evaluation, and Snow's lack of seniority. *Allen*, 545 F.3d at 394. Here, the evidence is undisputed that Collins suggested eliminating two NCM II positions as "appropriate for the workload and cost-cutting goal" and recommended to decision-makers that 2 NCM II position be cut. [R. 20-3, p. 98 (Collins Aff.)] Ultimately, decision-makers landed on cutting the position of NCML and two NCM IIs, along with other positions. *Id.* Anthem then commissioned a performance evaluation by Meska of its

employees holding positions identified for the RIF. *Id.* As Plaintiffs admit, those evaluations were based on several factors—quarterly performance evaluations from Thompson, caseloads, "success stories," Meska's observations, assessments of skills and competencies, and Meska's opinion of how their work fit in with company values. [R. 23-25 (Email from Meska to Collins); R. 31-2 (Thompson Dep.), pp. 115–18; R. 31-1 (Meska Dep.), pp. 181–83] Snow was graded as a "1" in both categories of Meska's evaluation, the lowest-possible score and tied for last with two other NCM IIs. [R. 23-25 (Email from Meska to Collins)] Because Snow had only the second-longest seniority of the three lowest-scoring NCM IIs, she was selected for discharge in the RIF. [R. 20-3, p. 100 (Jordanhazy Aff.)]

Plaintiffs argue that this explanation for her discharge—the performance evaluation pursuant to the RIF—was pretextual, for three reasons. First, Plaintiffs point to four younger case managers (all of whom were over 40) who were retained despite either lower performance scores (Caldwell, NCM II, age 46) or lack of board certification (Meador, NCM I, age 60; Waddle, NCM I, age 50; and Mefford, NCM II, age 45). [R. 22, p. 15] Plaintiffs argue that these younger case managers' retention despite fewer qualifications shows that Anthem must have been motivated by age. *Id.* Second, Caldwell, who was 46, was retained despite a low assessment score (1 on "skills and competencies" and 1 on "values," same as Snow) and less seniority than Snow, with Anthem explaining only that she was retained by accident. *Id.* at 16. Third, Meska's performance review took at most 74 minutes, which is not long enough to conduct a thorough assessment of each employee. *Id.* at 17.

Defendant asserts that the decision to select Snow in the RIF was based on performance-related factors that did not include age, and in fact, the two employees in her position of NCM II who were laid off (Snow and Siler) were the 2nd-oldest (Snow) and 5th-oldest (Siler) in the

group of eight. [R. 20-1, p. 8]. Defendant also notes that the employer may determine what it believes to be the correct metric of performance, regardless of formal qualifications. [R. 28, p. 6]

As with Sams's discharge, none of the evidence that Plaintiffs present shows that Anthem's cost-cutting and performance rationales in laying off Snow were pretextual. First, Plaintiffs' only contention that the performance evaluation had "no basis in fact" is that Snow was rated lower than other case managers with less experience who were not board-certified. [R. 22, pp. 12, 15] But "qualifications evidence is not sufficient to establish pretext in and of itself, and is only substantially probative of pretext in conjunction with other evidence of pretext." *Maxwell v. Cuyahoga Metro. Hous. Auth.*, No. 05CV2135, 2008 WL 746818, at \*13 (N.D. Ohio Mar. 18, 2008) (finding employer's reason for discharging employee pursuant to an RIF was not pretextual); *see also Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 627 (6th Cir. 2006) (same). When "there is little or no other probative evidence of discrimination, to survive summary judgment the rejected applicant's qualifications must be so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former." *Bender*, 455 F.3d at 627. Generally, "the law does not require [the] employer to make perfect decisions, but simply prevents employers from taking adverse employment actions for impermissible, discriminatory reasons." *Schoonmaker*, 595 F.3d at 269–70. Snow makes no argument for why being board-certified or having more years of experience makes her "so significantly better" than other case managers (Meador, Waddle, and Mefford) who were retained. Rather, Meska's evaluation, taking into account several factors, found her to be one of the lowest performers in the job. [R. 23-25 (Email from Meska to Collins)] In contrast, Meska assessed Mefford with the highest scores possible—two "3"s. *Id.* Further, Meska's evaluation of Snow did not differ significantly from Thompson's quarterly evaluations, which

found that Snow's performance only "met expectations." [R. 23-23 (Email from Thompson to Collins)][10] Snow also compares herself to Waddle (age 50) and Meador (age 60)—both of whom were in the NCM I position that was not considered as part of the RIF—instead of Snow's more senior NCM II position.[11] [*See* R. 29, pp. 28–30 (Email from Collins to Jordanhazy)] Therefore, this evidence, when standing alone, cannot carry Plaintiffs' burden of showing that the performance evaluation had "no basis in fact." *See Bender*, 455 F.3d at 628; *Schoonmaker*, 595 F.3d at 269–70.

Second, Plaintiffs' only evidence to show that the performance evaluation was insufficient to motivate her discharge was Anthem's decision to retain Caldwell instead of her, despite similarly low assessment scores and less seniority. [R. 22, p. 16] But Plaintiffs have simply no evidence that Anthem's retention of Caldwell was anything other than a mistake. [*See* R. 20-3, p. 101 (Jordanhazy Aff.)] In any event, out of the 8 NCM IIs in the entire department (all of whom were over 40), Anthem terminated only the 2nd and 5th oldest, hardly evidence of age discrimination. [R. 23-25 (Email from Meska to Collins); R. 22, p. 11] Further, notwithstanding any mistake by Anthem in retaining Caldwell, Snow was nevertheless correctly terminated under the evaluation criteria (lowest scores, with ties resolved by seniority) because she was not the most senior of the three NCM IIs who were all three tied with the lowest scores. [R. 23-25 (Email from Meska to Collins); R. 20-3, p. 100 (Jordanhazy Aff.)] Plaintiffs have not carried their burden of showing Anthem's proffered reason to discharge Snow was insufficient to motivate her discharge. *See Skelton*, 249 F. App'x at 461.

---

[10] Snow's score of 29 did not include Q1 and was not significantly lower than other case managers whose scores did include Q1 (under Thompson's evaluation metric, case managers accumulate points throughout the year and the best-performing case managers have the lowest scores). [R. 23-23 (Email from Thompson to Collins)]

[11] Mefford, whom Plaintiffs also assert is not board certified, was an NCM II with Snow. *Id.*

Finally, Plaintiffs appear to argue that the quickness with which Meska completed her performance review shows that it cannot have actually motivated Snow's discharge. [R. 22, p. 17] First, the Court can discern no evidence in the record indicating this was an insufficient amount of time to make the initial assessment. Even assuming Meska's evaluation was not a hallmark of thoroughness, courts have upheld performance evaluations pursuant to RIFs more slipshod that this one. For example, in *Sims*, an age discrimination case, plaintiff's manager selected him to be laid off pursuant to an RIF based on observations of his performance. 704 F.3d at 1331. The manager then—after making this decision—asked the plaintiff's co-workers whom they thought should be included in the RIF, "just for his knowledge and perspective." *Id.* Despite this odd process, the Eleventh Circuit found that the employer's decision to base discharge on the plaintiff's low performance was not pretextual, remarking that there was "overwhelming evidence of the legitimacy of [the manager's] decision." *Id.* at 1334; *see also Kumar v. Aldrich Chem. Co.*, 911 F. Supp. 2d 581, 591 (S.D. Ohio 2012) (finding performance review was not pretext for age discrimination even where the employer switched performance metrics once it began instituting the RIF).

Further, Meska's evaluation of NCM IIs and the NCML did not actually grade older employees worse than younger ones. In the evaluation, the ages of the four highest-performing case managers evaluated by Meska were 55, 65, 66, and 45; the ages of the four lowest-performing case managers were 57, 66, 65, and 46. [R. 23-25 (Email from Meska to Collins); R. 22, p. 11] These average ages are extremely close: 57.75 to 58.6. Similarly, Meska's evaluations across all positions raise no hint of discrimination. [*See* R. 20-3, p. 103–04 (Meska Aff.)] Of the 7 employees Meska assessed who were ultimately terminated, all had the lowest scores possible and spanned a broad range of ages: Perry (22), Lopez (24), Meiners (29), Sams (66), Snow (65),

Siler (57), and Riley (53). *Id.* Therefore, Plaintiffs have not carried their burden of showing that Meska's evaluation was discriminatory or did not actually motivate the decision to discharge Sams pursuant to the RIF. *See Kumar*, 911 F. Supp. 2d at 591.

With Snow's discharge, Plaintiffs have not carried their burden of showing that a reasonable juror could find by a preponderance of the evidence that the performance review pursuant to the RIF "had no basis in fact, did not actually motivate the defendant's challenged conduct, or was insufficient to motivate the defendant's challenged conduct." *Lefevers*, 667 F.3d at 725 (quoting *Schoonmaker*, 595 F.3d at 268). Accordingly, even when construing the evidence in favor of Plaintiffs, Plaintiffs cannot show by a preponderance of the evidence that the performance review was pretextual. Because Plaintiffs have not met their burden under the *McDonnell Douglas* framework, the Court will grant summary judgment to Defendant on the issue of Snow's age discrimination claim.

## B. FMLA Retaliation Against Sams

Plaintiffs next allege that Sams's discharge constituted retaliation for taking FMLA leave, in violation of the FMLA, 29 U.S.C. § 2615. Without direct evidence of retaliation, courts apply the same *McDonnell Douglas* burden-shifting framework described *supra* Section III.A to assess FMLA retaliation claims. *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). A plaintiff states a *prima facie* FMLA retaliation case when she shows:

> (1) [the employee] was engaged in an activity protected by the FMLA; (2) [the employer] knew that she was exercising her rights under the FMLA; (3) after learning of [the employee's] exercise of FMLA rights, [the employer] took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 573 (6th Cir. 2021) (quoting *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012)). To establish a causal connection, a plaintiff must

"proffer evidence sufficient to raise the inference that the protected activity was the likely reason for the adverse action."[12] *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (internal quotation marks omitted) (quoting *Zanders v. Nat'l R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990)). "In determining whether there is a causal relationship between a plaintiff's protected activity and an allegedly retaliatory act, courts may consider whether the employer treated the plaintiff differently from similarly situated individuals and whether there is a temporal connection between the protected activity and the retaliatory action." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516–17 (6th Cir. 2009).

Here, Plaintiffs have again alleged no direct evidence of retaliation. [R. 22, p. 18] It is undisputed that Sams can show the first and third prongs of the *prima facie* case: she took FMLA leave and was laid off. [R. 20-1, p. 13; R. 22, p. 18] Defendant, however, asserts that there was no causal connection between the FMLA leave and the discharge because, of the three periods that Sams took FMLA leave (October–November 2017, March 2018, and November–December 2018), only the final period of leave was close enough temporally to the RIF to be causally connected, and for that period of leave, neither Collins nor Meska (nor any of the decision-makers) learned of Sams's request for leave until after they submitted assessments of her performance to HR and the decision to eliminate her position was made. [R. 20-1, pp. 13–14] Plaintiffs respond that the connection stems from Sams's earlier FMLA leave periods, which occurred around the same time as her Performance Improvement Plan (PIP). They also point to her decision to have counsel send a letter to Anthem's President on April 4, 2018 raising

---

[12] The Sixth Circuit has noted that Title VII precedent informs FMLA retaliation claims. *Hunter v. Valley View Loc. Sch.*, 579 F.3d 688, 691 (6th Cir. 2009) ("We have often relied on Title VII precedent to analyze FMLA retaliation claims."); *Slusher v. U.S. Postal Serv.*, 731 F. App'x 478, 480 (6th Cir. 2018).

concerns about retaliation, [R. 23-13; R. 23-14], and to her latest FMLA leave period that occurred when Anthem was instituting the RIF process. [R. 22, pp. 4–6, 19]

Temporal proximity between FMLA leave and the employee's discharge may amount to a causal connection where the events are "very close in time," but where some time elapses between the two events, the "employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Chavez v. Dakkota Integrated Sys., LLC*, 832 F. Supp. 2d 786, 800 (W.D. Ky. 2011) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)) (finding a gap of four months between the FMLA leave and discharge pursuant to an RIF was not "very close in time"). Further, the decision-maker must actually be aware of the FMLA leave for there to be a causal connection. *See Mulhall v. Ashcroft*, 287 F.3d 543, 551 (6th Cir. 2002) (finding no causal connection where the district court had found on summary judgment that the decision-makers did not know of the employee's protected activity).

Here, as Defendant argues, there is little to connect any of Sams's FMLA leave periods with her discharge pursuant to the RIF. Her leave starting October 2017[13] (which Plaintiffs fail even to mention in their Complaint) was requested over a year before the RIF and was fully accommodated by Defendant. [R. 20-3, pp. 84–85 (FMLA leave form); R. 31-6 (Sams Dep.), pp. 86–88] With respect to the leave starting March 2018, which occurred intermittently from March to September, Sams applied for this leave on March 26, 2018. [R. 23-12 (FMLA leave summary)] This was *after* Sams was already placed on a PIP on February 16, 2018 and *after* Thompson started seeking a CAP for Sams in mid-March 2018. [R. 20-3, pp. 106–07 (Thompson Aff.); R. 22, pp. 5–6; R. 28, p. 7; R. 23-11, p. 3 (Incident Summary)] Her March 2018 leave,

---

[13] Sams's leave form indicates that the leave was authorized for the period of September 19, 2017 to September 18, 2018, but it appears that Sams did not meet with Meska to discuss the leave until October 4, 2017. [R. 20-3, pp. 84–85 (FMLA leave form)] Accordingly, the Court will refer to this period of leave as starting in October 2017.

therefore, could not have been the cause for her adverse personnel actions (the PIP and CAP).

Similarly, Sams's counsel's letter in April 2018 (raising retaliation concerns) fails to establish a

causal connection. Like her March 2018 FMLA leave request, this letter was sent seven months

prior to the RIF. Further, it is undisputed that Sams successfully completed the CAP by mid-June

with no other adverse actions until her termination as part of the RIF many months later. [R. 23-

15 (Email from Thompson to Scott)] Her supervisor, Thompson, advised at the time that Sams

"has met expectations and is performing at an acceptable level without pushback. As always

there is room for improvement, but she is giving it an honest effort." *Id.*

And concerning the last FMLA leave period in November 2018, like in *Mulhall*,

Plaintiffs have offered no evidence to suggest that the decision-makers (Collins, Shah, and

Lamoreaux) knew that Sams was taking FMLA leave when they recommended the NCML

position be eliminated under the RIF or that Meska was aware of the request prior to her

assessment of Sams. [R. 20-3, p. 98 (Collins Aff.); R. 20-3, p. 104 (Meska Aff.)]; *see Mulhall*,

287 F.3d at 551. On November 19, 2018, Sams applied to Defendant's headquarters leave-of-

absence office for intermittent FMLA leave to care for her ailing mother. [R. 23-20 (FMLA

leave summary); R. 20-1, pp. 13–14] During this time Sams and the NCM IIs were working from

home. [R. 31-2 (Thompson Dep.), pp. 120–21; R. 31-6 (Sams Dep.), pp. 20–21; R. 31-1 (Meska

Dep.), p. 209] It is undisputed that the decision to eliminate Sams's position was made in late

November 2018, [R. 20-3; pp. 97–98 (Collins Aff.)], and Meska made her assessments of

various employees, including Sams, on December 5, 2018. [R. 23-25 (Email from Meska to

Collins)] Collins and Meska deny any knowledge of Sams's November 2018 leave request until

December 14, 2018—*after* the decision was made to eliminate her position and *after* Meska's

assessments. [R. 20-3, pp. 98–99 (Collins Aff.); R. 20-3, p. 104 (Meska Aff.)] Likewise, Collins

makes clear that Sams's leave request was unknown at the time the decision-makers were considering positions for elimination and never discussed as part of that process. [R. 20-3, pp. 98–99 (Collins Aff.)] Plaintiffs have offered no evidence, direct or circumstantial, to rebut these denials.

But even assuming Plaintiffs can show a *prima facie* case of FMLA retaliation related to any or all of Sams's FMLA leave, Plaintiffs must clear the rest of the *McDonnell Douglas* burden-shifting framework to survive summary judgment. And for reasons discussed *supra* Section III.A, Defendant has presented a non-retaliatory reason for Sams's discharge—cutting costs pursuant to an RIF—and Plaintiffs have failed to present evidence such that a rational juror could find by a preponderance of the evidence that the reason was pretextual. Plaintiffs present no further evidence of pretext here. Further, the timing of Sams's periods of leave, without more, is insufficient to establish pretext. *Donald*, 667 F.3d at 763 ("[T]he law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext."). Sams has not presented sufficient evidence that Defendant included Sams in the RIF because she took FMLA leave, rather than because her job was no longer needed upon elimination of two nurse case manager positions she supervised. Accordingly, even when viewing the evidence in the light most favorable to Plaintiffs, Sams's FMLA retaliation claim fails. *See Charles v. Air Enters., LLC*, 244 F. Supp. 3d 657, 662 (N.D. Ohio 2017) (finding RIF was not a pretext for retaliation); *Foster v. Roadtec, Inc.*, No. 1:18-CV-270-TAV-CHS, 2021 WL 1910082, at *12 (E.D. Tenn. May 12, 2021) (same); *Knight v. Engert Plumbing & Heating, Inc.*, No. 3:07-CV-415, 2011 WL 3328399, at *8 (E.D. Tenn. Aug. 2, 2011) (same). The Court will grant summary judgment to Defendant on this claim, Count II.

C.  Retaliation Against Snow Under Ky. Rev. Stat. § 344

Next, Plaintiffs allege that Snow's discharge constituted retaliation for requesting an accommodation related to her hearing impairment in the fall of 2017,[14] in violation of the KCRA, Ky. Rev. Stat. § 344.280. [R. 1-2 (Complaint), ¶¶ 28–31] Retaliation claims under the KCRA are "evaluated using the same standard" as federal retaliation claims. *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009). The *McDonnell Douglas* burden-shifting framework is again used for cases involving circumstantial evidence, and the elements required to establish a *prima facie* case of retaliation are the same as those described *supra* Section III.B for FMLA retaliation. *Id.* (citing *Mickey*, 516 F.3d at 523–26). A plaintiff states a *prima facie* KCRA retaliation case when he shows: "(1) he . . . engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action." *Id.* (alteration in original) (quoting *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008)).

Defendant argues that Plaintiffs cannot establish a *prima facie* case of retaliation because—even if Snow can establish that she engaged in protected activity—that activity occurred around September 2017, over a year[15] before the RIF, and Snow has no other evidence of causation. [R. 20-1, pp. 15–16] Defendant further asserts that Anthem's 2018 actions of

---

[14] Snow also requested an accommodation to obtain a headset for working from home in 2018, but she concedes that there is "no relationship of the 2018 hearing device to the decision to terminate [her] employment." [R. 31-5 (Snow Dep.), p. 57] Further, the Complaint does not allege that the 2018 request could form a basis for retaliation. [R. 1-2 (Complaint), ¶¶ 12–17] Accordingly, the Court will only consider retaliation based on the 2017 request.

[15] Defendant erroneously asserted that the request was over two years before the RIF, [R. 20-1, pp. 15–16], but the Court notes that less than a year had passed.

requiring Snow to work from home in May 2018[16] and exempting her from a volunteer service requirement do not amount to adverse actions or evidence of intent to retaliate. *Id.* at 16.

Plaintiffs abandoned this claim in their Response, wholly failing to address this retaliation claim. [R. 22] "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

Notwithstanding Plaintiffs' failure to advance this claim, the only protected activity that Plaintiffs allege Snow was engaged in was her complaint of not being able to acquire a headset for a hearing impairment in a timely manner. But that complaint was resolved by November 2017. [R. 1-2 (Complaint), ¶ 29; R. 31-5 (Snow Dep.), pp. 22–28] Given that, at the absolute latest, Snow's issues with acquiring a headset were resolved by November 2017, and the RIF process did not start until November 2018, she must show evidence of causation in addition to temporal proximity to state a *prima facie* case of retaliation. *See Williams v. Zurz*, 503 F. App'x 367, 373 (6th Cir. 2012); *Chavez*, 832 F. Supp. 2d at 800. She has presented no other evidence of causation. Accordingly, even when viewing the evidence in the light most favorable to Plaintiffs, Snow's KCRA retaliation claim, Count III, fails. *See Williams*, 503 F. App'x at 373; *Chavez*, 832 F. Supp. 2d at 800. The Court will grant summary judgment to Defendant on this claim.

D.  <u>Wrongful Termination as Contrary to Public Policy</u>

Finally, Plaintiffs allege that they were discharged because they refused to violate legal and ethical standards, a tortious violation of Kentucky public policy. [R. 1-2 (Complaint), ¶¶ 32–35] Plaintiffs allege three instances of Anthem violating legal and ethical standards: Anthem's

---

[16] All NCM IIs were required to work from home in 2018. [R. 31-2 (Thompson Dep.), pp. 120–21; R. 31-6 (Sams Dep.), pp. 20–21]

direction to not identify case managers' names in medical records, its refusal to approve out-of-network baby formula, and its refusal to approve timely cancer treatment. [R. 22, pp. 7–8]

In Kentucky, absent "a specific contractual provision to the contrary," employment is generally terminable at will. *Miracle v. Bell Cty. Emergency Med. Servs.*, 237 S.W.3d 555, 558 (Ky. Ct. App. 2007); *Benningfield v. Petit Envt'l, Inc.*, 183 S.W.3d 567, 570 (Ky. Ct. App. 2005). "An employer may discharge his at-will employee for good cause, for no cause, or for a cause that some might view as morally indefensible." *Benningfield*, 183 S.W.3d at 570 (quoting *Firestone Textile Co. Div. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1983)). However, there is a narrow public policy exception providing employees with a cause of action for wrongful discharge where (1) the employee's discharge constituted a violation of a fundamental and well-defined public policy as evidenced by existing law; and (2) the public policy is evidenced by a constitutional or statutory provision. *Marshall v. Montaplast of N. Am., Inc.*, 575 S.W.3d 650, 652 (Ky. 2019).

> Only three circumstances exist in which a discharge will be actionable as contrary to public policy: (1) when there are "explicit legislative statements prohibiting the discharge," (2) when "the alleged reason for the discharge . . . was the employee's failure or refusal to violate a law in the course of employment," or (3) when "the reason for the discharge was the employee's exercise of a right conferred by well-established legislative enactment."

*Id.* (alteration in original) (quoting *Hill v. Ky. Lottery Corp.*, 327 S.W.3d 412, 422 (Ky. 2010)). "Further, the public policy involved must have an employment-related nexus." *Id.* The employment-related nexus "is critical to the creation of a clearly defined and suitably controlled cause of action for wrongful discharge." *Id.* at 653 (quoting *Grzyb v.* Evans, 700 S.W.2d 399, 402 (Ky. 1985)).

Defendant argues that Plaintiffs' claim of wrongful discharge fails as a matter of law for three reasons. First, Defendant denies that the practices that Plaintiffs complained of are illegal or violative of any laws, legislative statements, or rights protecting discharge of nursing employees. [R. 20-1, p. 17] Second, Defendant denies that these incidents were related in any way to Plaintiffs' discharge as part of the RIF. *Id.* at 18. Third, Defendant asserts that the public policy purportedly violated lacks an employment-related nexus. *Id.* at 17–18. In response, Plaintiffs assert that Anthem's conduct violated four statutes: Ky. Rev. Stat. § 314.091(1)(d) (negligence in the practice of nursing); Ky. Rev. Stat. § 314.091(h) (false or negligent entry of essential records); Ky. Rev. Stat. § 367.170 (unfair or deceptive trade); and Ky. Rev. Stat. § 304.12-230 (unnecessary denial of claims arising under insurance policies). [R. 22, p. 20]

In their Complaint, Plaintiffs appear to allege that their discharge triggers the public policy exception under prongs (2) and (3): that they were discharged for refusing to violate the law and for exercising a right conferred by legislative enactment. [R. 1-2 (Complaint), ¶ 33] Plaintiffs wholly fail to address their argument under prong (3) or develop how any of the statutes they identify confers a right they exercised. [*See* R. 22, p. 20] Upon review of the statutes identified by Plaintiffs, these statutes outline certain nursing standards, ethical trade practices, and insurance claims practices, but they do not provide an explicit *right* conferred to Plaintiffs, the exercise of which was the impetus for their discharge. *See Marshall*, 575 S.W.3d at 655.

The thrust of Plaintiffs' argument pertains to prong (2)—that they were fired for refusing to violate the law. This Court has previously held that a plaintiff's "subjective belief [about legal requirements] does not determine whether an action is one that is violative of public policy. Plaintiff must put forth evidence that the Defendant[']s actions were in fact violations of

Kentucky law." *Chavez*, 832 F. Supp. 2d at 803. In *Chavez*, for example, a quality-control

engineer for an auto parts supplier sued for wrongful discharge in violation of public policy after

he was laid off pursuant to an RIF. *Id.* at 789–93. During his employment, the engineer had

objected to the company's use of airbags that had been dropped from a forklift and possibly

damaged. *Id.* at 790–92. The engineer argued that he was laid off due to his concerns about using

the airbags, with the company's use of the airbags violating Ky. Rev. Stat. § 367.170 (the unfair

or deceptive trade statute previously described) and the Deceptive Business Practices section of

the penal code, Ky. Rev. Stat. § 517.020. *Chavez*, 832 F. Supp. 2d at 802. This Court rejected the

employee's argument that the use of the airbags violated these statutes, finding that the employee

had not provided any evidence beyond his own interpretations of the law that a violation had

occurred. *Id.* at 803 ("While Plaintiff may have disagreed with the Defendants['] interpretation

of the manufacturer's standards regarding the use of dropped airbags, he has not shown that the

Defendants' interpretation or their actions in placing the airbags into production was a violation

of any law.") Similarly, in *Smith v. LHC Group, Inc.*, No. CV 5:17-15-KKC, 2019 WL 6702423

(E.D. Ky. Dec. 9, 2019), *appeal dismissed*, No. 20-5040, 2020 WL 1856406 (6th Cir. Mar. 2,

2020), a nurse alleged that she was forced to quit her job at a home healthcare provider when she

refused to admit patients before documenting their need for home healthcare services. 2019 WL

6702423, at *2. The nurse argued that her refusal was required by Ky. Rev. Stat. §

314.091(1)(d), (h) (the nurse duty-of-care and record-keeping provisions previously described),

but the *Smith* court found that the nurse had not met the necessary burden of identifying facts in

the record that showed her employer had violated the law. *Id.* at *9 ("Even raising a 'legitimate

question' as to the legality of employer conduct is not necessarily enough for the basis of a

wrongful discharge claim." (quoting *Farrell v. Am. Ret. Corp.*, No. 2005-CA-001126-MR, 2006 WL 2519562, at \*6 (Ky. Ct. App. Sept. 1, 2006))).

Upon review of the statutes cited here, the Court cannot find that any create the basis for a wrongful-discharge claim based on the public policy exception to the terminable-at-will doctrine under the facts presented. Ky. Rev. Stat. § 314.091(1)(d), (h) is a statute relating to standards of care for licensed nurses. Ky. Rev. Stat. § 367.170 is a general statute dealing with deceptive trade practices, and Ky. Rev. Stat. § 304.12-230 deals generally with unfair claims settlement practices. Plaintiffs make only a cursory argument that Anthem's refusal to approve out-of-network baby formula and timely cancer treatment violated their duty of care as nurses and constituted an unfair claims settlement practice, and that Anthem's directive to omit case managers' names in patient records constituted a failure to "make essential entries on essential records." [R. 22, pp. 20–21]; Ky. Rev. Stat. § 314.091(1)(h). Aside from these broad statements indicating Plaintiffs' own interpretation of these statutes—and like the employees in *Chavez* and *Smith*—they do not identify any "facts in the record" pertaining to how Anthem's alleged refusals to approve treatment (or out-of-network baby formula) in a timely manner or its omission of case managers' names constituted violations of the law. *See Chavez*, 832 F. Supp. 2d at 803. The only fact that goes to developing this argument is Snow's allegation that she asked for and received an opinion from the Kentucky Board of Nursing that supported her belief that omitting case managers' names in records is an incorrect practice. [R. 31-5 (Snow Dep.), p. 41; R. 22, p. 7] Plaintiffs, however, do not provide any further details about this opinion, nor do they even contend that the Kentucky Board of Nursing determined the practice was illegal. Because Plaintiffs have only alleged their subjective beliefs that these practices violated the identified

statutes, their wrongful termination claim must fail. [*See* R. 22, p. 7; *Smith*, 2019 WL 6702423, at *9]

Furthermore, Plaintiffs present no evidence that Meska or the decision-makers on RIF selection, primarily Collins, Shah, and Lamoreaux, were actually motivated to discharge them based on their complaints. Meska was not aware of Plaintiffs' complaints regarding patient records until well after the RIF. [R. 31-1 (Meska Dep.), p. 210] Sams's baby-formula issue occurred after Meska sent her evaluations to Collins. [R. 31-6 (Sams Dep.), pp. 40–44] And while Meska did know about Snow's cancer-treatment complaints before conducting her performance evaluation, Plaintiffs present no evidence showing that Meska lowered her evaluation of Snow because of this in an attempt to get Snow discharged—rather, Meska did not know about the RIF when she made her evaluations and forwarded them to Collins. [R. 31-1 (Meska Dep.), pp. 176–77] Similarly, neither Collins nor any of the RIF decision-makers were aware of the cancer-treatment complaints, the baby-formula complaints, or the record-keeping dispute when they recommended the NCML and NCM II positions for the RIF and made final decisions. [R. 20-3, pp. 98–99 (Collins Aff.)] Accordingly, for the reasons outlined above, Plaintiffs cannot show that they fall within the public policy exception to the terminable-at-will doctrine. *See Chavez*, 832 F. Supp. 2d at 802; *Smith*, 2019 WL 6702423, at *9. The Court will grant summary judgment to Defendant on this claim, Count IV.

## IV.   Conclusion

For the reasons discussed above, summary judgment for Defendant is appropriate on all claims alleged by Plaintiffs. The Court being otherwise sufficiently advised, **IT IS HEREBY ORDERED** as follows:

1.   Defendant's Motion for Summary Judgment [**R. 20**] is **GRANTED**.

2.   A separate Judgment will be entered consistent with this Order.

This the 19th day of July, 2021.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY